**FILED
CLERK**

2/20/2019 9:59 am

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK

------------------------------X  Docket#
UNITED STATES OF AMERICA,     : 18-CR-292-JMA-ARL
                              :
    - versus -                : U.S. Courthouse
                              : Central Islip, New York
                              :
MAHAMOUD ALI BARAKAT,         : February 7, 2019
          Defendant           :
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
BEFORE THE HONORABLE ARLENE R. LINDSAY
UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**

**For the Government**:  **Richard P. Donoghue, Esq.**
United States Attorney

BY: **Charles P. Kelly, Esq.**
Assistant U.S. Attorney
610 Federal Plaza
Central Islip, New York 11722

**For the Defendant**:  **Robert A. Feitel, Esq.**
Law Offices of Robert Feitel
1614 20th Street, NW
Washington, D.C. 20009

**Transcription Service**:  **Transcriptions Plus II, Inc.**
61 Beatrice Avenue
West Islip, New York 11795
laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

1  THE CLERK:  Calling 18-CR-292, the United
2 States of America against Mahamoud Barakat.
3  Please state your appearances.
4  MR. KELLY:  For the United States Assistant
5 U.S. Attorney Charles P. Kelly.
6  Good afternoon, your Honor.
7  THE COURT:  Yes, good afternoon.
8  MR. FEITEL:  Good afternoon, your Honor, Robert
9 Feitel for defendant Mahamoud Barakat.
10  THE COURT:  All right.  So, Mr. Feitel, we're
11 here on an application to release the defendant on bail.
12 You want to -- I've read your submissions.  Do you have
13 anything you want to address to the court?
14  MR. FEITEL:  I would like to make sure that
15 your Honor read the submission and received it that I
16 filed earlier this morning.
17  THE COURT:  No, I don't have that.
18  MR. FEITEL:  Okay.  That's -- is it better if I
19 sit down or approach the lectern?
20  THE COURT:  No, it's fine if you sit.  Actually
21 it will be recorded.
22  MR. FEITEL:  Your Honor, I received the
23 government's last reply and felt compelled to respond to
24 it, so I filed something on ECF this morning.  Then I was
25 in transit trying to get here on time and I was not in a

1 position to call where I was. I apologize. It did occur
2 to me when I walked in that I should have verified that
3 chambers received that. I did file another submission.
4         THE COURT: All right. Mr. Kelly, have you
5 seen it?
6         MR. KELLY: Yes, your Honor.
7         THE COURT: Okay. All right. Then give me a
8 ten-minute break so I can take a look at it.
9         MR. FEITEL: Thank you for patience, your
10 Honor.
11 (Off the record.)
12         THE CLERK: Ms. Maya, I'm going swear you in.
13 (INTERPRETER SWORN)
14         THE INTERPRETER: Good afternoon, your Honor,
15 Maya Gray, Spanish interpreter.
16         THE COURT: Yes, good afternoon. All right.
17 So we're back on the record.
18         Mr. Feitel, I reviewed your submission of
19 today, February 7th. Is there anything that you want to
20 address on the record?
21         MR. FEITEL: I will try to be brief, although
22 whenever lawyers say that they -- they tend to ramble on
23 quite a bit.
24         ` I recognize that it's unusual that we're asking
25 for bond in a case like this. I think these are unusual

1  circumstances.  This is a case in which there's no
2  presumption that my client should be detained.  And I
3  don't believe there's any risk of flight.  And that the
4  conditions I've proposed would be sufficient to ensure
5  his return to court.
6  	I will say in regard to the conditions I'm --
7  I've been authorized to propose that Mr. Barakat be
8  allowed to live in my home in Fairfax County Virginia, as
9  well, if your Honor is concerned about where he'll stay
10  or what he'll do.  I spoke to my wife, who's also an
11  attorney about that she said that we would be willing to
12  have him.  We have the room in our house and he could be
13  monitored by GPS by the local pretrial service's office
14  in Virginia.
15  	I don't want to devolve into a lengthy
16  discussion about the merits of this case, but I do not
17  think that this case is particularly strong.  I was a
18  federal prosecutor for 22 years.  I've handled a number
19  of money laundering cases.  I disagree with the
20  government's assessment of this.  But even if you give
21  them some benefit that there is actually a case here,
22  which I am not convinced, I think it is a particularly
23  difficult one to prove because I don't really think it
24  exists.
25  	My client owned a company that imported cell

1  phones in Paraguay, He bought them on credit and then he
2  made payments for the phones. He did that by directly
3  sending money and other times using a "casa de cambio" or
4  an exchange house registered with the Central Bank of
5  Paraguay. The owner of that exchange house, Nader Farhat
6  is the absent co-defendant in this case.
7         And it appears from the government's
8  allegations that Mr. Farhat was involved in drug
9  trafficking. That he picked up drug trafficking funds on
10 the street and he used them to pay, I assume from
11 Mr. Barakat's bills to the vendors and possibly for
12 others, although I don't know that there's been -- I
13 haven't seen any tracing it's just an assumption I think
14 that the government is making.
15        I don't believe that there's any evidence of
16 record that my client knew anything about this, because
17 if there was he would have been indicted in the case in
18 Florida. There's an under seal case against Mr. Farhat
19 in the Southern District of Florida for drug trafficking.
20 If my client had been involved in laundering proceeds I
21 know from experience of the federal prosecutors in
22 Florida, in the Miami U.S. Attorney's Office who would
23 have put my client in that case.
24        The other point about this, your Honor, is that
25 once my client made his deposits in Paraguay he lost all

1   control over how the money was made.  All he would get
2   back would be receipts from the vendors showing payment.
3           Now, the government has accused us of
4   submitting some kind of falsified or a phoney document.
5   I tried to address that in my pleading.  From what's up
6   conversations provided by the government it appears that
7   my client after his arrest asked for his documents and
8   then -- which, of course, is not at all, I think
9   improper, inappropriate under the circumstances.
10          In a completely unrelated conversation that
11  took place between the owner of one of the companies
12  named Tronics and one of his workers, they discussed
13  sending statements that had been modified to reflect that
14  cash was paid.
15          I think that the government inadvertently or
16  mistakenly attributed those comments to my client.  My
17  client was not at all in any way involved in any changing
18  of the documents.  And to be fair I got all the documents
19  from my client's accounts.  And that's the part that I
20  used when I reviewed this case.
21          So as to the merits I think they are not
22  particularly strong.  And more importantly my client
23  agreed to come here.  The government says that that
24  doesn't mean anything, but I will say that I disagree.
25  His co-defendant is still in Paraguay and he's not

1 anywhere close to being here, because he's fighting his
2 extradition.  If my client were truly guilty and didn't
3 want to come here he would have been fighting his
4 extradition, I think in the same exact way instead he
5 waived his right to challenge the extradition and he came
6 here as promptly as he could.  Now, I don't believe the
7 government challenges that.
8 　　　　What the government does say is somehow my
9 client did a risk of flight.  And at the time that he was
10 arrested in Paraguay he had his bags packed and he and
11 his family were on their way to Lebanon.  I've tried to
12 explain that as well and support my argument with
13 documentary evidence.
14 　　　　`My client's family is of Lebanese -- my
15 client's family is from Lebanon.  They go there
16 periodically to visit family and friends.  I submitted an
17 exhibit to your Honor this morning showing that they
18 purchased tickets in March for a trip in late June, June
19 28th.  The government says that my client's bags were
20 packed at the time that he was arrested.  Not
21 surprisingly because his trip was two days later.  And if
22 I failed to mention it in my pleading my client's family
23 also purchased return tickets for August, approximately
24 six or seven weeks later.
25 　　　　The argument that he was planning on fleeing I

think is without weight. I think it's just -- I think it's -- it's a made up argument under the circumstances because anyone who -- and maybe the government didn't know when he bought the tickets, but if you look at the documentary evidence this -- this trip was planned way in advance. And my clients told me that they started looking for cheap air fare in January, months before they bought the tickets.

Mr. Barakat is not a wealthy millionaire as the government describes him. He owned a small company that imported cell phones and sold them, I believe at marginal profit rates.

In my analysis of whether bond should be granted I have pointed out that the defendant is in what's sort of a tangentially related case called the Qua-Ha (ph.) case. All of whom are charged with exponentially more serious offenses, laundering in millions and millions of dollars. And who have great personal wealth. Almost all of them, I think except for one are out on bond in the United States.

And what the government says is that my client doesn't have sufficient resources to guarantee his appearance and he lacks sufficient contacts with the United States.

As to the latter I say -- and I don't mean this

Proceedings

1  to be taken as facetious, but I say hootspa.  I mean,
2  they dragged him here from Paraguay when he had -- we'd
3  he'd never been here before.  And then they argue that he
4  has contacts.  So I think it's an -- I think it's
5  circular at best.  As to what he has to offer it's all
6  that we have.  He's willing to sign a $10 million
7  personal surety bond.  He's willing to wear GPS.  He's
8  willing to have a curfew.
9          THE COURT:  What's -- what's the value of your
10 home, Mr. Feitel?  I'm not being facetious either.  I
11 mean, you say that you're -- you're willing to go the
12 extra mile for your client what -- what about your
13 property?  I mean, if the court --
14         MR. FEITEL:  I'll be --
15         THE COURT:  -- determines that the bond as
16 proposed --
17         MR. FEITEL:  I'll be -- sure.
18         THE COURT:  -- is insufficient.
19         MR. FEITEL:  I'll be glad to -- I wonder if we
20 could do it -- and if we could do it at the bench,
21 because I'm always a little -- some things are a little
22 awkward for me to mention the value of my home in an open
23 courtroom.
24         THE COURT:  Well, I mean, you know, it has to
25 be an open courtroom.  It can't --

1          MR. FEITEL:  All right.  Then I will say my --
2          THE COURT:  And I don't want to put you on the
3 spot --
4          MR. FEITEL:  No, not at all.
5          THE COURT:  -- but I'm -- I'm very curious to
6 know.  And how long do you know the defendant?
7          MR. FEITEL:  I know the defendant only in terms
8 of my relationship with him.  I've spoken --
9          THE COURT:  As a -- as a client?
10         MR. FEITEL:  As his -- sure, as his -- as his
11 attorney, no other way.
12         THE COURT:  Okay.  Then forget it.  I thought
13 you had a deeper relationship with the defendant than
14 that.
15         MR. FEITEL:  No, but I will say that I'm
16 willing to post my house as valued at more than a million
17 dollars.
18         THE COURT:  No, no good.  I mean, I -- when you
19 offered to have him come live with you I incorrectly
20 assumed that there had been some connection beyond just
21 this case.  Okay.
22         MR. FEITEL:  No.  I should you --
23         THE COURT:  All right.  Sorry.
24         MR. FEITEL:  -- it wouldn't be the first --
25 we've had other -- we've had another client live with us.

1 My -- my wife is also a criminal defense lawyer, so...

2 THE COURT: Okay. You know, I find that very
3 rare as an offer, so that's why I presumed that there was
4 a more substantial relationship, but -- all right. Go
5 on. I didn't mean to interrupt.

6 MR. FEITEL: So in the balance of things my
7 client has nothing more to offer. The government has his
8 passport. The law does not require that we find
9 conditions that will absolutely, positively guarantee his
10 appearance. That's -- that's not possible, because he
11 could flea. I mean, a norm -- a practical, realistic
12 defense lawyer would have to admit that the possibility
13 exists, but I think that the likelihood is so rare in
14 this case that your Honor should let him out on bond
15 under the most restrictive conditions that we can
16 possibly think of. He has no passport, it's with the
17 government. He's in a country where he doesn't speak the
18 language. He's -- he's not near anywhere. Where exactly
19 would he go? How exactly would he flee?

20 The government always says that, well, they can
21 -- someone can flee, but how would they actually do that
22 without a passport, without resources. I'd be willing to
23 have control over his financial life as well to make sure
24 that he doesn't have any money lying around if that would
25 make the court happy as well.

1    I just think that under the -- under the
2 circumstances given that he -- he didn't try to flee when
3 he was Paraguay when he could have.  He didn't fight his
4 extradition to come here.
5    And then this case is moving at a very, very,
6 very slow pace.  I believe there's a lot more discovery
7 to be provided.  Your honor knows that there was a fire
8 in the jail.  The MDC was closed.  I couldn't see my
9 client.  He couldn't talk to me.  His family didn't know
10 what was happening.  I went to try to see him, and even
11 though they reopened the jail there was, from want of a
12 better word, an incident involving citizens who rushed
13 the jail lobby and had to be repelled with tear gas.  So
14 my ability to prepare this case and my client's ability
15 to assist in his defense is being compromised in this
16 case.  Even under the best of circumstances when I go to
17 the NVC it's very hard to find a quiet and private place
18 to review the documentary evidence.  The time is limited.
19 I can only bring in my laptop from eight in morning till
20 four in the afternoon. And there's lots of other lawyers
21 who want to see their clients.  My ability to talk to him
22 about this is being impacted.  And it's also complicated
23 to begin with because I need to explain to him in Spanish
24 what all the documents that are English said.
25    So I am asking your Honor with as much

1  sincerity as -- as I can to consider letting my client
2  out under these restrictive conditions.  And I am willing
3  to post my home with my wife's consent to do it.
4          THE COURT:  No.  I wouldn't even accept that.
5  Without your having any kind of relationship with the
6  defendant that's --
7          MR. FEITEL:  No, I wouldn't represent
8  someone --
9          THE COURT:  -- it's really not -- not useful.
10         MR. FEITEL:  Right.  No, I wouldn't represent
11 someone that I -- that I'm personally friends with I
12 don't think.
13         THE COURT:  Well, I want to move past that.
14         Mr. Kelly.
15         MR. KELLY:  Thank you, your Honor.
16         To clarify defendant has submitted a false
17 document on his motion papers, has not withdrawn it, has
18 not apologized for it.  That document was created at the
19 request of his client, Mr. Barakat who said in an audio
20 file this is going to help you and I prove we had no
21 shady business.
22         His client, Mr. Barakat had requested invoices
23 and statements a number of times prior to sending the
24 audio file, but it appears that what was sent was not
25 what he wanted until he sent the audio file.  And the

1 audio file was the first time where he referred to I need
2 the statements to prove we had no shady business or bad
3 business depend --
4     THE COURT: That's his voice on the audio file?
5     MR. KELLY: Yes. The agent has confirmed that,
6 that the audio file is defendant's voice. It's been
7 translated by the certified federal agent. And they've
8 compared other recordings -- another recording of
9 Mr. Barakat to it to confirm that it's his voice on the
10 audio file. The reason it went from the person who
11 received the bulk cash in New York to the person in Miami
12 was simply to have the audio file translated, so when the
13 message comes from the coconspirator in Miami that is
14 just reflecting what's on the audio file. And that may
15 be why defense counsel misapprehends the movement of the
16 messages.
17     What there's no dispute about is that the
18 document that his client received was altered. And once
19 he received the altered document that deleted all the
20 references to cash he stopped requesting any further
21 statements. He had clearly received what he wanted at
22 that point. And we think that the request for it is
23 relevant. It shows consciousness of guilt. We think
24 these actions are relevant because they show an attempt
25 to obstruct this court and mislead this court as to what

1 the facts were regarding his dealings on Long Island and
2 the bulk cash he had sent here for payment to his
3 coconspirator.
4 　　　　　Moving on from that document.  Defense counsel
5 says, as he said in his letter that almost all of the --
6 that all of the Qua-Ha defendants are charged with
7 exponentially more serious offenses.  All the carge
8 defendants who have been released are charged with
9 exponentially more serious offenses.  That's absolutely
10 not true.  No defendant is charged with a more serious
11 charge than his client, who's charged with a 20-year
12 money laundering conspiracy.  And that's the top charge
13 in the carge case.  And the only defendants released in
14 carge were all U.S. citizens.  The non-U.S. citizen
15 remains in prison.
16 　　　　　In sum there's no dispute that defendant as
17 part of his motion papers submitted a fraudulent document
18 to this court that was created at the request of his
19 client, has not withdrawn it, has not apologized for
20 submitting it, and we believe that alone is clear
21 evidence that defendant should not be released because he
22 has busied himself since he was arrested with -- in
23 Paraguay with attempts to obtain documents that he could
24 use to mislead this very court on this very motion.
25 　　　　　And we agree -- the U.S. Attorney's Office

1  concurs with pre-trial that detention should continue.

2          THE COURT:  All right.  Anything else?  Okay.
3  I've reviewed the submissions.  I went back and reviewed
4  earlier submissions dated January 31st.  The government --
5  actually December 20th, starting with December 20th,
6  submission of January 17th, January 31, February 5th and
7  today's submissions of February 7th.  And while I don't
8  disagree that there -- there might be a -- well, let me
9  just back up.

10         First, to the extent that counsel has proposed
11 to having the defendant reside with him.  In my judgment
12 one of the central features of having sureds is that
13 there be a relationship, a substantial relationship such
14 that the defendant would have an interest in not harming
15 the person who poses as a sured or offers to be a
16 sureter.  That is an important feature of that kind of
17 bail proposal.  And when counsel proposed that as an
18 option I thought there was that kind of relationship, but
19 apparently not, so the offer to have the defendant come
20 and live with him as made by Mr. Feitel is just not
21 satisfactory.

22         Okay.  All right.

23         In reviewing everything this is an indicted
24 case, there is a presumption of probable cause.  And
25 while, Mr. Feitel, you've argued heavily about the merits

Proceedings                                              17

1  of the action probable cause has been established by
2  virtue of the indictment, and so there is reason to
3  believe your client engaged in the conduct that's
4  alleged.  And the conduct that's alleged indicates that
5  he has access to substantial assets.  And, in fact, moved
6  substantial sums of money in connection with some elicit
7  activity.
8         He may eventually establish his innocense
9  or -- let me put it a different way, the government may
10 eventually fail in its proof at trial, but right now I'm
11 -- here's the presumption and it's been established by
12 virtue of an indictment.
13        I am also being influenced by the submission of
14 Exhibit 1, which coincidentally omits the one word that
15 would make the difference between whether or not these
16 are cash transactions and/or legitimate commodity
17 transactions.  You know, it's hard for me to believe that
18 that was just a happenstance and just a document that
19 happened to come into the possession of your client,
20 which was submitted to the court for consideration in
21 deciding whether or not you should be bailed out.  That's
22 a coincidence I find hard to accept, so I -- I am of the
23 view that your client had some participation in the
24 preparation of that document.  He was the one who was
25 going to benefit by it.  And so it was intended to

1 mislead the court, at least conceal the cash nature of
2 those transfers.
3 　　　　I'm going to also rely on the fact that
4 although your client, and I don't think there's any
5 dispute of it, agreed to come here, and that's something
6 that works in his favor, the fact of the matter is he has
7 substantial connections to Brazil and to Lebanon,
8 jurisdictions that would not extradite him under these
9 circumstances.  He lives outside the United States.  All
10 of his businesses to the extent they -- that he has any
11 business is outside the United States.  His family lives
12 outside the United States.  His whole life is outside the
13 United States.
14 　　　　And the proposal that -- that an uncle with a
15 $150,000 valued home would be sufficient to satisfy this
16 court that he would not present a flight -- risk of
17 flight is wholly insufficient and for that reason the
18 detention will continue.
19 　　　　I'm sorry, Mr. Feitel, that you're having such
20 difficulty with respect to accessing your client.
21 Perhaps arrangements could be made or some -- if there's
22 some application that could be made that would be
23 consistent with the facility's policies that the court
24 could assist you with by entering an order we'd be happy
25 to do that, but right now your client will continue in

Proceedings

1  detention.
2  Is there anything else I have to address?
3  MR. FEITEL:  Not at this time, your Honor.
4  THE COURT:  All right.  Thank you.
5  MR. KING:  No, your Honor.  Thank you.
6  (Matter adjourned)
7  -oOo-

Proceedings

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this 19th day of February, 2019.



Rosalie Lombardi
Transcription Plus II